IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 19-41545 |
| **Fencepost Productions, Inc.,** | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 19-41542 |
| **NPB Company, Inc.,** | ) | |
| | ) | Chapter 11 |
| Debtor. | ) | |

## ASSOCIATED BANK, N.A.'S OBJECTION TO
## DEBTORS' JOINT MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS

Senior secured creditor Associated Bank, N.A. ("Associated") hereby files this objection (the "Objection") to Debtors Fencepost Productions, Inc. ("Fencepost") and NPB Company, Inc.'s ("NPB", together with Fencepost, the "Debtors") Joint Motion for Entry of Interim and Final Orders (A) Authorizing Post-Petition Financing and (B) Request for Scheduling Hearings on Interim and Final Approval [Doc. 21] (the "DIP Motion") and states as follows:

### INTRODUCTION

1. Associated and Debtors entered into a revolving credit facility secured by first-priority liens in Debtors' personal property. Availability on the loan was contingent on the value of Debtors' eligible accounts receivable and inventory. Debtors filed these cases hours before an emergency hearing to appoint a receiver over them. The basis for the proposed receivership was Associated's discovery that Debtors had overstated and inflated their eligible inventory by at least $3 million and Debtors' apparent diversion of its accounts receivable proceeds from Associated's

1

lockbox. Associated also sought a judgment against Debtors for at least $7.6 million due to their breach of the loan.

2. Since filing these cases to avoid the receivership, Debtors have filed a single motion, the DIP Motion. The DIP Motion fails to include any evidentiary support: (i) it fails to attach anything to support Debtors need for and ability to repay a $6.5 million DIP loan at 12.5% interest in one year; (ii) it fails to include the underlying credit agreement or proposed order in clear violation of Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (iii) while the DIP Motion proposes that Debtors will grant liens only in post-petition inventory and accounts receivables, it fails to provide any specifics or mechanics on how Debtors will account for, preserve, protect and segregate the pre-petition collateral and its proceeds; and (iv) it fails to provide Associated with any adequate protection while it needlessly holds on to Associated's collateral. To this end, it is unclear how Debtors have managed to operate for almost a week with any authority to use cash collateral. The DIP motion should be denied. Given these circumstances, Associated intends to move for the appointment of a chapter 11 trustee or to convert these cases.

## BACKGROUND

### I. Debtors and Associated Enter Into the Loan.

3. On or about April 10, 2018, Associated and Debtors executed that certain Loan and Security Agreement (as amended, the "Loan Agreement", a true and correct copy of which is attached hereto as **Exhibit 1**) whereby Associated agreed to loan Debtors up to $13 million under a revolving credit facility (the "Loan"). Availability under the Loan is calculated based on a

percent of Debtors' eligible accounts receivable and eligible inventory.[1] Debtors granted Associated a first-priority security interest in substantially all of their personal assets and property (the "Collateral").[2] Associated properly perfected its security interests in the Collateral by, among other things, filing UCC-1 financing statements evidencing its liens (true and correct copies of which are attached hereto as **Exhibit 2**). Accordingly, Associated holds a valid and properly perfected first-priority security interest in and lien on the Collateral.

4. On or about April 10, 2018, Old Dominion Apparel Corporation executed that certain Guaranty whereby it unconditionally guaranteed Debtors' obligations under the Loan (the "Guaranty", a true and correct copy of which is attached hereto as **Exhibit 3**).

## II. Debtors' Financial Condition Deteriorates and They Default.

5. Debtors struggled throughout 2019. Their unaudited, interim, consolidated financial statements as of September 30, 2019, a true and correct copy of which are attached hereto as **Exhibit 4**, show that as of September 30, 2019, Debtors had: (i) roughly $10,000 in cash; (ii) negative equity valuation of over $4.3 million; and (iii) lost almost $200,000 in 2019.

6. The borrowing base certificate dated November 6, 2019 submitted by Debtors to Associated admitted that Debtors were over-advanced by at least $436,174.12 (the "November 2019 Borrowing Base Certificate", a true and correct copy of which is attached hereto as **Exhibit 5**). Even so, Debtors subsequently requested that Associated advance funds for their November 6, 2019 payroll, which Associated did.

7. On November 27, 2019, Associated issued and delivered to Debtors a notice articulating numerous events of default under the Loan and Guaranty and accelerating the Loan, a

---

[1] Loan Agreement §§ 2.1; 1.1 "Borrowing Base," "Eligible Account," "Eligible Inventory," "Revolving Commitment," and "Revolving Loan Availability."

[2] Loan Agreement § 8.

3

true and correct copy of which is attached hereto as **Exhibit 6**. As of November 27, 2019, there was at least $7,658,701.14 due from Debtors under the Loan, which they have failed to pay.

**III.   Associated Files the Receivership Action to Protect the Collateral.**

8.   Associated has also discovered that Debtors have overstated their eligible inventory to induce Associated to over-advance millions of dollars on the Loan and appear to have diverted proceeds from their accounts receivable away from Associated's lockbox.

9.   A significant portion of the Collateral is Debtors' inventory (the "Inventory"), consisting of finished apparel. While Debtors reported a total consolidated inventory of $5.8 million as of June 30, 2018, this figure ballooned to $9.182 million as of June 30, 2019. This increase also coincided with Debtors convincing Associated in September 2018 to increase the advance rate for eligible inventory from 60% to 70% under the Loan.[3]

10.   Associated performed an Inventory cost test as of July 31, 2019 to determine the Inventory's per unit cost and overall value. The results of this Inventory cost test were then compared with unit costs reported by Debtors on the August 9, 2019 and August 14, 2019 Borrowing Base Certificates. Overall, the comparison showed that Debtors had overstated the value of their Inventory on the August 14, 2019 Borrowing Base Certificate by nearly $953,000. A true and correct copy of this comparison is attached hereto as **Exhibit 8**.

11.   Associated conducted another Inventory audit in October and November 2019. An Inventory test count at Debtors' Missouri warehouse on October 22, 2019 showed a gross Inventory shortage of roughly $336,000 for NPB and roughly $100,000 for Fencepost. Debtors were not able to provide a satisfactory explanation or supporting documents for these shortages.

---

[3] *See* First Amended to Loan and Security Agreement dated September 24, 2018, a true and correct copy of which is attached hereto as **Exhibit 7**, § 2.B.

12. The problems at Debtors' New Jersey warehouse were even worse. Debtors had submitted an Inventory report claiming that Fencepost had $2,367,874.32 in Inventory there as of October 22, 2019. Associated later learned that Debtors had only two containers at this warehose on that date. Matthew Gray ("Gray"), Debtors' CEO, confirmed in a November 1, 2019 email that these containers hold about $100,000 of inventory on average. Accordingly, there appears to have been a difference of over $2 million between the value of reported and actual Fencepost Inventory at the New Jersey warehouse as of October 22, 2019.

13. From August 2019 onward, Fencepost also appears to have improperly included as eligible Inventory in borrowing base certificates submitted to Associated Inventory that was subject to liens granted by Fencepost to Newbridge Global Sourcing, LLC ("Newbridge").[4] During this time period, Newbridge filed three financing statements with the Missouri Secretary of State against Fencepost, claiming a purchase money security interest in certain purchase orders (the "Newbridge Financing Statements", true and correct copies of which are attached hereto as **Exhibit 9**). The styles of Inventory listed in these purchase orders are also found and listed in Inventory reports submitted by Fencepost to Associated during the same time.

14. In November 2019, payments from Debtors' accounts receivable to Associated began to dramatically decrease. Under the Loan, Debtors' collections from accounts receivable must pass through a lockbox at Associated. (Loan Agreement § 6.4.) While the first half of November saw almost $1.9 million flow into the lockbox, only $6,144.72 came in from November

---

[4] "Eligible Inventory" under the Loan Agreement cannot be "subject to any other assignment, claim or Lien." (*Id*. § 1.01 "Eligible Inventory"; § 1.01 "Lien.")

19th through December 12th.[5] This decline suggests either that Debtors' businesses have effectively ended or they have been improperly diverting accounts receivable proceeds.

15. Due to concerns regarding Debtors' Inventory and accounts receivable proceeds, Associated filed a complaint on December 4, 2019, in the United States District Court for the Western District of Missouri for breach of the Loan and Guaranty and asked for the expedited appointment of a receiver to take control of Debtors' businesses and personal property (the "Receivership").[6] Associated offered to fund a receiver budget as a part of the Receivership.

**IV. Debtors File for Bankruptcy Only Hours Before Receivership Hearing.**

16. The Receivership Court scheduled a hearing on Associated's emergency motion to appoint a receiver over Debtors for December 18, 2019 at 1:00 pm. (Receivership Action Doc. No. 11.) That morning (the "Petition Date"), Debtors filed voluntary chapter 11 petitions under the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Code") to stay the Receivership.

17. On the Petition Date, Associated filed with this Court and emailed Debtors' counsel a notice that Associated did not consent to Debtors' use of cash collateral. (Doc. No. 3.) Debtors have not filed a motion to use cash collateral.

18. On December 19, 2019, Debtors filed the DIP Motion. It seeks approval of a $6.5 million loan facility with 12.5% annual interest to be repaid in 1 year (the "DIP Loan") with Alterna Capital Solutions secured by a lien on post-petition inventory and accounts receivable. It does not include a copy of any credit agreement, proposed order or any other documents. Debtors

---

[5] See Loan History Statement as of December 12, 2019, a true and correct copy of which is attached hereto as **Exhibit 10**).

[6] See Complaint [Doc. No. 1] and Emergency Motion to Appoint Receiver and Request for Expedited Hearing and Suggestions in Support Thereof [Doc. No. 2] filed in *Associated Bank, N.A. v. Fencepost Productions, Inc., et al.*, Case No. 4:19-cv-00971-LMC (W.D. Mo. Filed Dec. 4, 2019), which documents and exhibits thereto Associated incorporates herein by reference.

never asked Associated or its other lenders to fund the DIP Loan. Associated would consider funding a budget in these cases if its various objections were addressed.

## ARGUMENT

19. The DIP Motion is woefully deficient and should be denied. As a threshold matter, it fails to attach the most basic documents and information required by Bankruptcy Rule 4001(c), including the underlying credit agreement and proposed order. It also provides no evidentiary support, let alone anything that suggests that the DIP Loan is necessary, sufficient or supported by sound or reasonable business judgment. Indeed, the DIP Motion is not in the best interests of the estate or its creditors and fails to provide any specificity regarding how Debtors will account for, preserve, protect and segregate the existing, pre-petition inventory and accounts receivable as well as their proceeds from the post-petition assets. Nor does it account for how Debtors have been operating since the Petition Date without any authority to use cash collateral or provide Associated with any adequate protection.

I. **Legal Standard**

20. The DIP Motion seeks approval to obtain post-petition financing under section 364(c)(2) of the Code, which provides that if Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1)," the court may authorize them to obtain financing "secured by a lien on property of the estate that is not otherwise subject to a lien."

21. Bankruptcy Rule 4001(c) further requires that the DIP Motion "shall be accompanied by a copy of the credit agreement and a proposed form of order." Fed. R. Bankr. P. 4001(c)(1)(A). It also must include a concise statement regarding certain critical provisions of the credit agreement, including the events of default and borrowing conditions. *Id*. 4001(c)(1)(B). Finally, Bankruptcy Rule 4001(c) requires that the DIP Motion describe the nature and extent of

7

HB: 4823-0045-9439.1

Case 19-41545    Doc# 38    Filed 12/24/19    Page 7 of 12

certain provisions, including (i) any proposed adequate protection for pre-petition creditors or use of property of the estate and (ii) deadlines associated with the plan confirmation process. *Id*. 4001(c)(1)(B)(ii) and (vi).

22. To prevail on the DIP Motion, Debtors bear the burden on four issues: (1) the proposed financing is an exercise of sound and reasonable business judgment; (2) no alternative financing is available on any other basis; (3) the financing is in the best interests of the estate and its creditors; and (4) as a corollary to the first three points, no better offers, bids or timely proposals are before the court. *In re Western Pac. Airlines, Inc.*, 223 B.R. 567, 572 (Bankr. D. Colo. 1997).

II. **The DIP Motion Should Be Denied for Numerous, Independent Reasons.**

23. As a threshold matter, the DIP Motion must be denied because it fails to satisfy numerous requirements under Bankruptcy Rule 4001(c). First, it fails to attach a credit agreement and a proposed order. Fed. R. Bankr. P. 4001(c)(1)(A). Second, it fails to provide the required statements regarding events of default or borrowing conditions under the DIP Loan. *Id*. 4001(c)(1)(B). Finally, the DIP Motion fails to provide the nature and extent of any (i) adequate protection for Associated and/or the use of the Collateral (*id.* 4001(c)(1)(B)(ii)) or (ii) deadlines associated with the plan confirmation process (*id*. 4001(c)(1)(B)(vi)).

24. The DIP Motion also fails to satisfy any of the first three issues articulated by the *Western Pacific* court. Overall, it is not supported by any evidence – there are no schedules, no declaration, no projections and no budget.

25. First, there is nothing to support the contention that the proposed financing is an exercise of Debtors' sound and reasonable business judgment. Unlike in *Western Pacific*, Debtors offer no evidence to show they are "potentially profitable" should they borrow another $6.5 million at a 12.5% annual interest rate. There is also nothing to support Debtors' ability to repay the DIP

Loan within a year. Indeed, Debtors have refused to provide this Court with any insight into its precarious financial status and offer nothing to suggest a viable path forward in these cases.

26. Second, there is only a bald assertion that Debtors were unable to obtain unsecured credit under Section 503(b)(1), which does not satisfy Debtors' evidentiary burden.

27. Third, there is nothing to support that the DIP Loan is in the best interest of the estates and their creditors. While the proposed DIP Loan claims that it will only be secured by post-petition collateral and proceeds generated therefrom, Associated has serious concerns regarding Debtors' ability and honesty in accounting for, preserving, protecting and segregating the pre- and post-petition collateral. Associated has a first priority secured lien in, among other things, Debtors' Inventory and accounts receivables, which extends to their proceeds. *See* 11 U.S.C. § 552(b)(1). The DIP Motion fails to provide any: (i) schedule or detail regarding these assets or their value as of the Petition Date, (ii) indication of how Debtors will segregate the pre- and post-petition Collateral, (iii) information on whether Debtors have the capacity or ability to segregate the Collateral, and (iv) safeguards to avoid commingling. Likewise, the DIP Motion fails to show how Debtors will effectively maximize the pre-petition Collateral. At a minimum, this Court should allow for an investigation period to confirm the Collateral's amount and value and assured that it is safeguarded.

28. The DIP Motion's lack of detail coupled with Debtors' past fraudulent conduct and/or gross mismanagement and Debtors refusal to even discuss these issues with Associated until December 23rd have only amplified Associated's concerns. Historically, Debtors have been unable to properly and reliably track and report the Collateral. Instead, they have overstated and fabricated Inventory figures and diverted accounts receivable proceeds. Debtors have not earned the carte blanche that the DIP Motion seeks.

9

HB: 4823-0045-9439.1

Case 19-41545    Doc# 38    Filed 12/24/19    Page 9 of 12

29. Furthermore, the DIP Motion does not provide Associated any adequate protection or offer any mechanism by which to disburse the current and future pre-petition cash collateral to Associated. Debtors have no authority to use and admit that they have no need to hold on to this cash collateral, or for that matter any of Associated's Collateral, under the proposed DIP Loan structure. To the extent it needlessly chooses to endanger Associated's Collateral by doing so, it should be required to provide Associated with adequate protection.

30. Finally, the DIP Motion does not ask to use cash collateral, Debtors have not filed a cash collateral motion, and Associated explicitly refused to consent to Debtors' use of cash collateral. Thus, it is unclear how Debtors have funded operations since the Petition Date without violating section 363(c) of the Code. This is yet another cause for concern that highlights Associated's fears with the proposed DIP Loan structure going forward. Debtors should provide this Court and its creditors an explanation and proof that no cash collateral has been used since the Petition Date before any relief is granted in their favor.

**WHEREFORE**, Associated respectfully requests that this Court: (i) deny Debtors' use of cash collateral; (ii) deny the current DIP Motion as inadequate and require them to file another more fulsome motion; and (iii) grant such other relief as is just and equitable.

10

HB: 4823-0045-9439.1

Case 19-41545    Doc# 38    Filed 12/24/19    Page 10 of 12

Dated this 24th day of December, 2019     Respectfully submitted,


By: */s/ Michael D. Fielding*

John J. Cruciani
KS 16883
Michael D. Fielding
KS 20562
Husch Blackwell LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Tel: 816.983.8000
Fax: 816.983.8080
john.cruciani@huschblackwell.com
michael.fielding@huschblackwell.com

- and –

John P. Sieger (*admitted pro hac vice*)
Illinois Bar No. 6240033
Paul T. Musser *(admitted pro hac vice)*
Illinois Bar No. 6304946
Charles A. DeVore *(admitted pro hac vice)*
Illinois Bar No. 6305736
Katten Muchin Rosenman LLP
525 W. Monroe Street
Chicago, IL 60661-3693
Tel: 312.902.5200
Fax: 312.902.1061
paul.musser@katten.com
charles.devore@katten.com
john.sieger@katten.com

*Counsel for Associated Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of December, 2019, the above and foregoing document was filed electronically using CM/ECF and a true and correct copy of the above and foregoing was served as follows:

__X__ upon filing, the CM/ECF system sent notification to Debtor's counsel and all parties participating in the CM/ECF system in this matter.

*/s/ Michael D. Fielding*
Attorney