**SO ORDERED.**

**SIGNED this 31st day of March, 2021.**



Dale L. Somers
United States Chief Bankruptcy Judge

Designated for online and print publication

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF KANSAS

In re:

**Fencepost Productions, Inc.**
**NPB Company, Inc.**
**Old Dominion Apparel Corp.**
             **Debtors.**

**Case no. 19-41545 (Lead)**
**Case no. 19-41542**
**Case no. 19-41543**
**Chapter 11**
**(Jointly administered)**

**Memorandum Opinion and Order**
**Overruling Debtors' Objections to Proofs of Claim filed by the BMS**
**Group and Granting in Part and Denying in Part Debtors' Omnibus**
**Motion to (A) Disqualify Votes of Subordinated Creditors,**
**(B) Designate Plan Rejection, (C) Invalidate Unsigned Ballots, and**
**(D) Strike Plan/Disclosure Statement Objection**

The Debtors in these jointly administered cases seek Court orders to

bar participation in the confirmation process by creditors BMS Management,

Inc. and related individuals[1] (collectively the "BMS Group"), who prepetition entered into debt subordination agreements with Associated Bank, N.A ("Associated"), the Debtors' principal creditor. To accomplish this, Debtors have filed objections to the BMS Group's proofs of claim[2] and moved for orders to (a) disqualify votes of subordinated creditors, (b) designate plan rejection, (c) invalidate unsigned ballots, and (d) strike plan/disclosure statement objection ("Motion").[3] Associated fully supports Debtors' positions.[4] The BMS Group opposes the claims objections[5] and the Motion.[6]

The Court finds that the subordination agreements are enforceable to the extent that the parties agreed that Associated's claim would be paid in full before any payments are made to the BMS Group but are ineffective to deprive the BMS Group of their status of creditors for purposes of Chapter 11. Nevertheless, because the amount of Associated's unsecured claim and

---

[1] The Individuals are: Steve and Jerri Michaels, Robert and Linda Means, Lee and Ruth Brandt, Dan and Minda Bayer, John Means, and Dan and Mary Means.

[2] Docs. 312 to 318.

[3] Doc. 337. Debtors appear by Jonathan A. Margolies.

[4] Doc. 372. Associated appears by Michael D. Fielding, John J. Cruciani, John P. Sieger, Paul T. Musser, and Charles A. DeVore.

[5] Docs. 321-327. The BMS Group appears by Bruce J. Woner.

[6] Docs. 360 and 384.

2

Debtors' financial circumstances establish that the BMS Group under all conceivable scenarios will not receive any distribution from Debtors in this Chapter 11 proceeding, or if the cases are converted to Chapter 7, the Court finds that the BMS Group lacks prudential standing to participate in the confirmation process. As a result, the Court overrules the claims objections[7] and grants in part and denies in part the Motion.[8]

## I.  Background Facts

Debtors Fencepost Production, Inc. ("Fencepost") and related Debtors NPB Company, Inc. ("NPB") and Old Dominion Apparel Corporation ("Old Dominion") filed for relief under Chapter 11 on December 18, 2019. The cases are jointly administered, but not consolidated.

In April 2018, Associated agreed to loan up to $14 million to Debtors Fencepost and NPB, secured by personal property. Contemporaneously, the BMS Group executed subordination agreements with Associated (the "Subordination Agreements"). Among other things, the Subordination Agreements provide that payment of "all Junior Liabilities [*i.e.*, Fencepost's obligations to the BMS Group] shall be postponed and subordinated to the payment in full in cash of all obligations of all Senior Liabilities [*i.e.*,

---

[7] Docs. 312 to 318.

[8] Doc. 337.

3

Fencepost's liabilities to Associated]."[9] Each member of the BMS Group

agreed that in the event of dissolution, reorganization or similar proceeding,

including bankruptcy, of Fencepost, they would not "object to or interfere with

the exercise of rights of" Associated and, in any such proceeding:

> (a) "All payments . . . in respect to the Junior
> Liabilities to which [BMS Group] would be entitled if
> the Junior Liabilities were not subordinated . . . shall
> be made directly to [Associated].
> (b) [BMS Group] shall promptly file a claim . . .
> and shall cause said claim . . . to be approved and all
> payments and other distribution in respect thereof to
> be made directly to [Associated].
> (c) [BMS Group] irrevocably agrees that
> [Associated] may, its sole discretion, in the name of
> [BMS Group] . . . , demand, sue for, collect, or receive
> and receipt for any such payments or distributions.
> (d) [BMS Group] irrevocably agrees that
> [Associated] may, at its sole discretion . . . file and
> prove, and vote or consent to any such proceeding
> with respect to, any claims of [BMS Group] relating
> to the Junior Liabilities.
> (e) [BMS Group] shall not argue any position,
> make any motion, file any pleading or otherwise take
> any action contrary to the priorities and other rights
> of the parties as provided herein.[10]

Associated and the BMS Group filed proofs of claim. Associated's claim

is for approximately $7.7 million. The BMS Group claims are approximately

$5.3 million total. Debtors filed their Amended First Joint and Consolidated

---

[9] Doc. 360, p. 16.

[10] *Id.* at pp. 17-18.

Chapter 11 Plan of Reorganization (the "Plan")[11] and the Joint and Consolidated Disclosure Statement (the "Disclosure Statement")[12] on November 11, 2020. In the Plan, Associated's secured claim is class 2. General unsecured creditors, including Associated's unsecured claim which is at least $5.2 million, are in class 5 and will be paid 15% of allowed claims over 36 months. The BMS Group subordinated unsecured claims are in a separate class, class 5A, and will be paid $10,000 each month for 12 months. These payments will enure to the benefit of Associated. Equity interests in the Debtors are assigned to Class 6 and will retain ownership.

On December 8, 2020, Debtors objected to the proofs of claim filed by the BMS Group.[13] The objections are based upon the contention that under the Subordination Agreements all right to payments and power to vote the claims are vested in and belong to Associated. The BMS Group responded to the objections.

Associated voted the BMS Group claims in favor of the Plan, and the BMS Group cast competing ballots rejecting the Plan. The BMS Group also objected to the Disclosure Statement and the Plan. On January 11, 2021,

---

[11] Doc. 303.

[12] Doc. 304.

[13] Docs. 311-318.

5

Debtors filed the Motion now before the Court.[14] Responsive pleadings were filed,[15] and a hearing was held. Thereafter, on January 22, 2021, the Court entered an order finding that the Disclosure Statement was not approved and set a deadline for filing of an amended statement. An amended disclosure statement was filed.[16] It states, "under Chapter 7, unsecured creditors would receive nothing . . .[and] [a]ll assets would be turned over to the secured and priority creditors."[17]

## II. Analysis

### A. The provisions of the Subordination Agreements purporting to relinquish the BMS Group's voting rights are not enforceable in this case.

In support of their Motion, Debtors argue that all relevant aspects of the Subordination Agreements are enforceable, such that Associated has the right to vote the claims of the BMS Group.[18] In response, BMS Group

---

[14] Doc. 337.

[15] Docs. 360, 372, 375, and 384.

[16] Doc. 371.

[17] *Id*. at p. 18.

[18] A respected commentator states, "Because subordination agreements are essentially intercreditor agreements, the debtor in possession or trustee does not succeed to the subordination rights of one of its own creditors as against another of is creditors." 4 *Collier on Bankruptcy* ¶ 510.03 (Richard Levin & Henry J. Sommer, eds.-in-chief, 16th ed 2020). This leads the Court to question whether Debtors are the correct parties to raise these issues, but because Associated, a party to the Subordination Agreements, supports Debtors' positions and the BMS Group has not

6

acknowledges that payment of their claims are subordinated to payment of Associated's claim, but argue that the portions of the Subordination Agreements purportedly assigning their rights to vote are not enforceable.

The starting point for analysis is § 510(a),[19] which provides: "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." Generally, "applicable nonbankruptcy law" is construed to mean state law, and a court looks state law to determine the scope and enforceability of a subordination agreement. In this case, however, no state law issues have been raised. Rather, the question is whether the Code precludes enforcement of the subordinated creditors' agreements that Associated may exercise BMS Group's voting rights. Courts interpreting the meaning of subordination under § 510(a) have reached different conclusions.[20] The two leading cases are

---

raised the issue, the Court will assume Debtors are correctly asserting the rights granted Associated in the Subordination Agreements.

[19] 11 U.S.C. § 510(a). All future references to Title 11 shall be to the section number only.

[20] Avid S. Kupetz, *Intercreditor Subordination Agreements and Voting Rights in Chapter 11*, 2010 Norton Ann. Survey of Bankr. Law 11 (2010).

7

*LaSalle Street,*[21] which supports the BMS Group's position, and *Aerosol Packaging*, which supports Debtors' position.[22]

In *LaSalle Street*, prepetition debtor's two major secured creditors, Bank of America, as senior creditor, and North LaSalle Limited Partnership (LaSalle), as the subordinated creditor, entered into a intercreditor agreement which contained a broad subordination provision, including an agreement that the bank could vote LaSalle's claim in any bankruptcy. The bank filed a declaratory judgment action seeking an order that the voting subordination agreement controlled LaSalle's voting rights in the plan confirmation process. The court held that the Code, rather than the language of the intercreditor agreement, controlled voting rights.[23] It started its analysis by noting that § 1126(a) provides that "[t]he holder of a claim" may vote to accept or reject a plan, and found that none of the arguments submitted by the bank justified deviation from the statute's plain language. The court discussed four arguments. First it held that the fact that LaSalle agreed that the bank could vote on its behalf was not controlling because "[i]t

[21] *Bank of America, Nat'l Ass'n v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle Street P'ship)*, 246 B.R. 325 (Bankr. N. D. Ill. 2000).

[22] *Blue Ridge Invs., II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43 (Bankr. N.D. Ga. 2006).

[23] *In re 203 North LaSalle Street P'ship*, 246 B.R. at 330-31.

8

is generally understood that prebankruptcy agreements do not override contrary provisions of the Bankruptcy Code."[24] Second, it held that § 510(a), providing for the enforcement of subordination agreements, does not allow for waiver of voting rights under § 1126(a) because subordination affects the priority of payment of claims in bankruptcy, not voting rights.[25] Third, Rule 3018(c), which provides that acceptance or rejection of a Chapter 11 plan must be signed by the "the creditor or equity security holder or an authorized agent," does not provide a basis to enforce the vote relinquishment, since the bank would not be signing a ballot as the agent of LaSalle. An agent has a fiduciary duty to act at the direction of the principal, but here the bank would be acting on its own behalf, most likely contrary to the those of LaSalle. Fourth, the result that § 1126(a) controls was found to be "completely consistent with reasonable Bankruptcy policy" as expressed in the Code.[26] Subordination affects the priority of payments, but not the right to payment, such that generally a subordinated creditor has the potential of receiving a distribution. Finding that the subordinated creditor has a right to vote "assures that the holder of a subordinated claim has a potential role in

---

[24] *Id.* at 331.

[25] *Id.* (citing *Beatrice Foods Co. v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.),* 5 B.R. 734, 736 (Bankr. D.  Minn. 1980)).

[26] *Id.*

9

negotiation and confirmation of a plan, a role that would be eliminated by enforcing contractual transfers of Chapter 11 voting rights."[27] The court cited with approval, an earlier case concluding that "[t]here is no indication that Congress intended to allow creditors to alter, by a subordination agreement, the bankruptcy laws unrelated to the distribution of assets."[28]

When arguing that the BMS Group may not vote their claims, Debtors rely primarily upon *Aerosol Packaging*.[29] In that case, in conjunction with Wachovia making a prepetition loan to the debtor, Blue Ridge and the debtor executed a subordination agreement in favor of Wachovia. In the agreement, Blue Ridge agreed to refrain from taking other actions against the debtor until Wachovia was paid in full and agreed to permit Wachovia to act on its behalf, including the right to vote the claims of Blue Ridge, in any bankruptcy proceeding. Blue Ridge voted to reject the debtor's plan, and Wachovia, on behalf of Blue Ridge, voted to accept the plan. Blue Ridge filed a motion asserting that the right of Wachovia to vote its claim was unenforceable, relying on *LaSalle Street*. The court rejected that authority and found that "[t]he express terms of the Subordination Agreement . . . compel the

---

[27] *Id.*

[28] *In re Hart Ski Mfg. Co.*, 5 B.R. at 736.

[29] *In re Aerosol Packaging, LLC*, 362 B.R. at 43.

10

conclusion that the right to vote any claim of Blue Ridge in Debtor's bankruptcy was assigned by Blue Ridge to Wachovia,"[30] making Wachovia the "duly authorized agent of Blue Ridge."[31]  It reasoned that the subordination agreement appeared to be enforceable under applicable state law, and rejected the reasoning of *LaSalle* finding that although § 1129(a) grants a right to vote to a holder of claim, it does not expressly or implicitly prevent that right from being delegated or bargained away by the holder of the claim. Additional cases support enforcement.[32]

The issue of whether intercreditor agreements transferring voting rights in conjunction with subordination of claims are enforceable has been

---

[30] *Id*. at 47.

[31] *Id*.

[32] *E.g, In re Itemlab, Inc*, 197 F. Supp. 194, 198 (E.D.N.Y. 1961) (enforcing voting subordination under the Bankruptcy Act); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (enforcing voting subordination where no argument to the contrary submitted). *But see In re SW Boston Hotel Venture, LLC*, 460 B.R. 38, 52 (Bankr. D. Mass. 2011) (rejecting *Aerosol* as less persuasive than *LaSalle Street*).

11

addressed by commentators.[33] They, like the case law, reach contrary positions. For example, one article concludes:

> [W]e expect courts will simply enforce agreements which are freely made amongst sophisticated parties according to the terms of such agreements. This would render an intercreditor agreement's waiver or assignment of ancillary bankruptcy rights unenforceable only under traditional contract law doctrines such as fraud, duress, capacity, illegality, unconscionability, and the Statute of Frauds.[34]

Another writer concludes: "A voting assignment provision should be included among those contract rights that are unenforceable in bankruptcy."[35] He reasons that "[s]tatutory construction is a holistic endeavor and courts must consider 'the provisions of the whole law, and its object and policy' before

---

[33] *E.g*, Mark N. Berman and David Lee, *The Enforceability in Bankruptcy Proceedings of Waiver and Assignment of Rights Clauses within Intercreditor or Subordination Agreements*, 20 J. Bank. L. & Prac. 6 Art.1, 12 (Nov. 2011); Cameron M. Fee, *Disenfranchisement under Section 510(a) of the Bankruptcy Code*, 90 Am. Bankr. L.J. 467, 499 (2016); David S. Kupetz, *Intercreditor Subordination Agreements and Voting Rights in Chapter 11*, 2010 Norton Ann. Survey of Bankr. Law 11 (2010); Shane G. Ramsey, *Are Subordination Agreements Really Enforceable?,* 31 Amer. Bankr. Inst. 52 (2010); Rufus T. Dorsey and Matthew M. Weiss, *Third Circuit's Warning Shot to Senior Creditors in In re Tribune*, 39 Amer. Bankr. Inst. J. 14 (2020).

[34] Mark N. Berman and David Lee, *The Enforceability in Bankruptcy Proceedings of Waiver and Assignment of Rights Clauses within Intercreditor or Subordination Agreements*, 20 J. Bank. L. & Prac. 6 Art.1 at 13.

[35] Cameron M. Fee, *Disenfranchisement under Section 510(a) of the Bankruptcy Code*, 90 Am. Bankr. L.J. at 499.

determining that § 510(a) authorizes voting assignments."[36] The ABI

Commission to Study the Reform of Chapter 11 recommended the following

as a principle:

> The contractual assignment of voting rights in favor of senior creditors under an intercreditor agreement, subordination, or similar agreement should not be enforced. Subordinated creditors should retain the right to vote on a plan (or their right to be deemed to have done so under section 1126(g) of the Bankruptcy Code) and to invoke the protections of section 1129(b).[37]

This Court finds the reasoning of *LaSalle Street* more persuasive than

*Aerosol* and holds that the attempted modification of voting rights stated in

the Subordination Agreements is not enforceable. The reasoning of the

*LaSalle Street* court is sound. The agreements of the BMS Group that

Associated could vote on their behalf did not appoint Associated as their

agent. Unlike an agent, who has fiduciary duty to act at the direction of the

principal, Associated would be acting for its own benefit, contrary to the

wishes of the BMS Group.

---

[36] *Id.* at 498 (quoting *Kelly v. Robinson*, 479 U.S. 36, 43 (1986)).

[37] *American Bankruptcy Institute Commission to Study the Reform of Chapter 11: 2012-2014 Final Report and Recommendations*, 23 Am. Bankr. Inst. L. Rev. 1, 284 (2015).

**B.      The objections to the BMS Group's proofs of claim are overruled.**

Debtors' objection to the BMS Group proofs of claim is that by virtue of the Subordination Agreements "all rights to payments and power to vote" arising from the BMS Group "are vested in and belong to the Bank."[38] The BMS Group responds that the fact that their claims are subordinated to Associated "does not invalidate" the claims.

The Court agrees with the BMS Group. As examined above, subordination merely reorders priorities among creditors. Unlike the circumstance where a claim is assigned to an other party, subordination does not involve transfer of the subordinated creditor's legal interest.

Further, although § 510(a) provides that subordination agreements are enforceable in bankruptcy, § 1129(b)(1), the cramdown provision, states a nonconsensual plan may be confirmed "[n]ot withstanding § 510(a)." This means that § 1129(b)(1) overrides § 510(a). The discussion of the unfair discrimination element of cramdown in the legislative history of the Code, as stated in the House Report,[39] exclusively involves the treatment of like-kind

---

[38] *E.g.* Doc. 312, p. 4. Debtors also assert the proofs of claim should be rejected because there is no possibility that the BMS Group will receive any distribution. Claims with no hope of payment are a common occurrence in bankruptcy proceedings.

[39] H.R. Rep. No. 95-595, at 416-417 (1977).

14

creditors affected by subordination agreements.[40] The examples include treatment of fully subordinated unsecured claims.[41] Congress' understanding of unfair discrimination is premised upon the assumption that fully subordinated claims are allowed. In accord with this assumption, Debtors' proposed Plan classifies and provides for payment on the BMS Group claims.

Debtors' objection to the proofs of claim filed by the BMS Group are overruled.

## C. The doctrine of prudential standing bars the BMS Group from participating in the confirmation process.

### 1. The Court accepts the factual basis for the Debtors' arguments.

Debtors challenge the standing of the BMS Group to object to Debtors' proposed plan. The factual predicate for the Debtors' standing objection is the contention that "[t]here is no scenario whatsoever which exists to provide any payment to the" BMS Group.[42] When responding to the arguments regarding standing, the BMS Group does not contest this contention.[43] Moreover, it is

---

[40] *See In re Tribune Co.*, 972 F.3d 228, 239 (3rd Cir. 2020).

[41] H.R. Rep. No. 95-595, at 416-417 (1977). *See* discussion at 7 *Collier on Bankruptcy* ¶ 1129.03[3][b][iv].

[42] Doc. 375, p. 9.

[43] Rather, the BMS Group argues that in making the assertion that Associated's claim will not be fully satisfied, "Debtors fail to acknowledge the fact that nonetheless, the BMS Group are holders of valid claims, which affords them a

15

supported by a review of the Subordination Agreements, the proposed Chapter 11 Plan, and the amended disclosure statement. Under the Subordination Agreements, all payments made to the BMS Group on their claims must be transferred to Associated until Associated's unsecured claim is paid in full. Under the Plan, Associated's unsecured claim is at least $5.2 million and, on account of that claim, it will receive 15% of its claim paid over 36 months. It will also receive the $10,000 per month for 12 months payable on each of the BMS Group claims.[44] The disclosure statement states that in a Chapter 7 liquidation unsecured creditors would receive nothing.[45] The Court therefore accepts the factual basis for Debtors' standing arguments at face value and accepts for purposes of its analysis the premise that there is no circumstance under which the BMS Group has any financial stake in the outcome of the confirmation process.

---

legally protected interest in these bankruptcy proceedings." Doc. 384, p. 5.

[44] Doc. 303, pp. 10 & 12.

[45] Doc. 371, p. 18.

16

## 2. There are three standing doctrines requiring consideration.

Standing is composed of "three distinct doctrines limiting which parties may can bring a claim in federal court."[46] They are constitutional standing, statutory standing, and prudential standing. Article III constitutional standing reflects the restriction of the jurisdiction of federal courts to actual cases or controversies by requiring that a plaintiff show an injury in fact, causation, and redressability.[47] Statutory standing refers to circumstances when the right to bring an action is conferred by statute.[48] Prudential standing includes the "general prohibition of a litigant's raising another person's legal rights . . . and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."[49] The parties' briefs conflate these three doctrines.

---

[46] 33 Charles Allen Wright, Charles H. Koch, Jr., & Richard Murphy, *Federal Practice and Procedure*, § 8332 at 87 (2018).

[47] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[48] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).

[49] *Id*. at 126.

17

### 3.    The BMS Group has statutory authority to participate in the confirmation process.

The Court finds that the members of the BMS Group have statutory authority to participate in the confirmation process. "Statutory standing is simply statutory interpretation, the question is whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury."[50] In Chapter 11 cases, a party's right to be heard is addressed by § 1109. Subsection § 1109(b) provides a party in interest "may be heard on any issue in a case." Although the subsection does not expressly define party in interest, it does provide that party in interest includes a creditor.[51] As discussed above, with respect to the objection to the proofs of claim filed by the BMS Group, the Subordination Agreements do not divest the BMS Group of their claims and they therefore are creditors. They continue to hold claims against the Debtors; the Subordination Agreements change only the priority

---

[50] *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 295 (3rd Cir. 2007) (ERISA case).

[51] The Bankruptcy Court for the Eastern District of Missouri has held that unimpaired creditors lack standing to object to confirmation under § 1109(b). It found § 1109(b) does not mean that every creditor is a party in interest. It only means a creditor may be a party in interest, which category is limited to those creditors holding "a pecuniary interest that could be adversely affected by the outcome of the proceeding." *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 515 (Bankr. E.D. Mo. 2012). This Court respectfully declines to follow this construction of § 1109(b). It is unsupported by the clear language of the Code. The requirement of a pecuniary interest is, in this Court's opinion, better analyzed under the requirement of prudential standing.

of their claims. As holders of claims, the members of the BMS Group may vote to accept or reject a plan under § 1126(a). As parties in interest, the members of the BMS Group may object to confirmation of a plan under § 1128(b). Subordinated creditors have statutory authority to participate in the Plan confirmation process.

### 4. The Court declines to decide whether the BMS Group lacks Article III standing.

Next the Court addresses constitutional standing. From a cursory consideration, it appears that a creditor with no financial stake in the outcome of a debtor's request for confirmation cannot satisfy the three requirements for constitutional standing: injury in fact, causation, and redressability. But closer examination casts doubt on this conclusion and whether Article III standing is the appropriate vehicle for analyzing the issue presented. The Court declines to decide the objection on this basis. Neither Debtors, nor Associated, which supports Debtors on the standing question, cite any cases applying Article III standing principles to the participation of subordinated creditors in confirmation proceedings. This Court also has not found any such case law. Article III standing has developed to "ensure that federal courts do not exceed their authority."[52] Certainly this Court has

---

[52] *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1547 (2016).

19

jurisdiction to decide confirmation issues. A respected commentator, when discussing the requirements of Article III, observes without citation to case law, that "the situations in which the participation of any 'party in interest' in any particular  proceeding might fail to satisfy" the Article III requirement "are relatively limited."[53] Further, the Third Circuit Court of Appeals finds "[p]ersuasive authority indicates that Article III standing and standing under the Bankruptcy Code are effectively coextensive."[54] A New York court states, "[g]enerally, a 'party in interest' with respect to a particular issue will also meet the requirement for Article III standing with respect to that issue."[55] This Court therefore declines to decide whether the BMS Group has Article III standing, since it is not necessary in the present circumstances.

### 5. The Court finds that the doctrine of prudential standing precludes the BMS Group from participating in the confirmation process.

Rather than deciding the standing issue under the Article III doctrine, the Court turns to the doctrine of prudential standing. That doctrine

---

[53] 7 *Collier on Bankruptcy* ¶ 1109.04[4][a].

[54] *In re Global Indus. Tech., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011).

[55] *In re Teligent, Inc.*, 417 B.R. 197, 210 (Bankr. S.D.N.Y. 2009) (also holding that prudential standing may limit statutory standing), *aff'd,* No. 09 Civ. 09674(PKC), 2010 WL 2034509 (S.D.N.Y. 2010), *aff'd,* 640 F.3d 53 (2nd Cir. 2011).

20

encompasses "the general prohibition on a litigant's raising of another person's legal rights."[56] This prohibition is applied on an issue-by-issue basis.[57]

This Court agrees with the following observation of the Second Circuit Court of Appeals.

> The prudential concerns limiting third-party standing are particularly relevant in the bankruptcy context. Bankruptcy proceedings regularly involve numerous parties, each of whom might find it personally expedient to assert the rights of another party even though that other party is present in the proceedings and is capable of representing himself. Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.[58]

The Kansas District Court quoted the foregoing with favor when affirming the bankruptcy court's holding that "third-party prudential concerns prevent[] . . . a class 5 creditor[] from challenging those portions of the reorganization plan that did not affect its direct interests and from asserting the rights of the class

---

[56]*Lexmark Int'l, Inc.*, 572 U.S. at 126; *The Wilderness Soc'y v. Kane Cnty., Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc). See 33 *Fed. Practice & Procedure* § 8343 (concluding that of the three principles that had been involved in prudential standing, only the limitation of asserting rights of third parties remains in the prudential category).

[57] *In re Quigley Co., Inc.*, 391 B.R. 695, 705 (Bankr. S.D N.Y. 2008).

[58] *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 644 (2nd Cir. 1988).

Case 19-41545    Doc# 397    Filed 03/31/21    Page 21 of 24

4 creditors."[59] It rejected the contention that party in interest status under §
1109(b) allows a creditor to litigate absolutely any issue under Chapter 11,
finding that the statute does not waive "traditional prudential limitations on
standing."[60]

In this case, the BMS Group, if permitted to participate in the Plan
confirmation proceedings, would be litigating issues affecting the rights of
third parties, not itself. As noted above, there is no scenario under which the
BMS Group will receive any direct financial benefit. If the Plan were amended
to provide larger payment to Class 5A, the subordinated BMS Group claims,
Associated could benefit financially, but other unsecured creditors would likely
receive less. The BMS Group seeks to vote against confirmation to force
Debtors to satisfy the § 1129(b) requirements of cram down. But the BMS
Group would not benefit from enforcement of the requirements that the
Debtors' plan not discriminate, be fair and equitable to impaired classes, and
satisfy the absolute priority rule. It is other creditors, Associated in particular,
who have a financial stake in these matters. This case therefore fits with the
circumstance of special concern to the Second Circuit, quoted above, when a

---

[59] *In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863 (D. Kan. 1996).

[60] *Id.*

22

"constituency seeks to disturb a plan of reorganization" though asserting rights other than its own.

The Court holds that prudential considerations bar the members of the BMS Group from exercising their rights to vote against confirmation and to challenge specific aspects of Debtors' Plan which do not directly impact their financial interests.

### D. The additional issues raised by Debtors in their Motion are moot in light of the Court's previous rulings.

Debtors make separate arguments that the BMS Group's ballots should be disqualified as unauthorized because of the subordination agreements, that the votes should be designated under § 1126(e) as not having been cast in good faith, that the ballots should be invalidated because not in correct form, and the objections be stricken because they interfere with Associated's rights under the Subordination Agreements. In light of this Court's previous rulings on the issues in this case, the Court finds these contentions need not be addressed because they are moot. Because the BMS Group lacks standing to participate in the Plan confirmation process, their ballots and objections to the disclosure statement and to the Plan will not be considered.

23

## III.  Conclusion

For the forgoing reasons, the Court finds that the Subordination Agreements do not require disallowance of the proofs of claim filed by the BMS Group, are enforceable as to the reordering of the priority of payment of the unsecured claims of the BMS Group and Associated, and are not effective to release the BMS Group's voting rights. However, under the circumstances of this case where there is no circumstance under which the BMS Group, as fully subordinated creditors, can receive any financial benefits from a Chapter 11 plan or from a Chapter 7 liquidation, prudential standing principles preclude the BMS Group from participating in the disclosure statement and Plan confirmation process. The Court overrules the claims objections[61] and grants in part and denies in part the Motion.[62]

**It is so ordered.**

**###**

---

[61] Docs. 312 to 318.

[62] Doc. 337.

Case 19-41545    Doc# 397    Filed 03/31/21    Page 24 of 24